## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **WILLIAM VARDEMAN,** | )( | **Civil Action No.: 4:20-cv-3242** |
| | )( | **(Jury Trial)** |
| *Plaintiff,* | )( | |
| | )( | |
| **v.** | )( | |
| | )( | |
| **CITY OF HOUSTON, TEXAS; and** | )( | |
| **RICKEY DEWAYNE SIMPSON,** | )( | |
| *Individually,* | )( | |
| | )( | |
| *Defendants.* | )( | |

### PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

**TO THE HONORABLE LEE H. ROSENTHAL:**

**NOW COMES** William Vardeman, hereinafter called Plaintiff or Vardeman, and amends his complaint as a matter of course pursuant to FRCP 15 and complains of the City of Houston and Rickey Dewayne Simpson, hereinafter called Defendants, and for cause of action shows unto the Court the following:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over Plaintiff's federal claims, under 28 U.S.C. § 1331, 42 U.S.C. §§ 1983 and 1988, and supplemental jurisdiction, under 28 U.S.C. § 1367(a), to hear Plaintiff's state law claims, if any.

2.     Venue is proper in this Court, under 28 U.S.C. § 1391(b), because the incident at issue took place in Harris County, Texas within the United States Southern District of Texas.

### PARTIES AND SERVICE

3.     Plaintiff, William Vardeman, is an Individual who resides in St. Charles, MO.

4.     Defendant, the City of Houston, is a municipal corporation located in the State of

Texas and incorporated under the laws of the State of Texas. Defendant City of Houston, has answered this lawsuit and is represented by its attorney of record, Patricia A. Harris, and can be served with this Second Amended Petition pursuant to the Federal Rules of Civil Procedure of Civil Procedure via this Court's electronic case filing system.

5.      Defendant, Rickey Dewayne Simpson (Simpson) is an individual and employee of the City of Houston. Defendant, Rickey Dewayne Simpson and has been served with process.

### FACTS

6.      On Thursday, September 20, 2018, Vardeman arrived in Houston for a business meeting on Southwest Flight No. 1684 around 1:15pm.

7.      Plaintiff's wife, daughter, and granddaughter flew in on a later flight, Southwest Flight No. 2300.

8.      Vardeman went back to the airport after his meeting to pick up his family but unfortunately their flight was delayed although the Southwest phone App said it was arriving early.

9.      After making several loops at the passenger pick up area Mr. Vardeman found a space to park and tried to call his wife. As Vardeman was trying to call his wife, he was approached by a traffic attendant who requested that he move his vehicle forward.

10.      As he was complying with the attendant's request, he began to move forward about 30 yards when his wife called and informed him that they were out of the baggage claim and asked where he was located.

11.      Vardeman parked quickly and jumped out of his vehicle and opened the tailgate to load their luggage. As he did so, a woman who was dressed as a security attendant who apparently worked for the Houston Airport System, asked him if he was picking someone up.

12.     He replied that he was picking up his wife and daughter and they were on their way out. A few seconds later another vehicle pulled in and she said "Sir you need to move your vehicle." He replied that he would do so and jumped back in his truck. As he began to pull away, he noticed his daughter walking up right behind his vehicle while holding her baby and pulling her bag, with his wife behind her pushing a stroller.

13.     He quickly jumped out of his truck and reopened the tailgate to load their luggage.  As he grabbed the first bag and started to load it in the vehicle, the airport employee approached him again and said **"I told you to move your fucking car."** He informed her that his family is right here and he would load them up and leave immediately. She replied "I don't give a fuck and you are going to move that car." She proceeded to call additional officers, telling them "I have a passenger who is refusing to move his car."

14.     While she was calling additional officers, Vardeman was quickly loading his family and their luggage in his truck. As he began to close the tailgate to leave, he heard a voice behind him.

15.     When he turned around he observed a male, approximately 20-25 years old, later identified as Rickey Dewayne Simpson, who was an employee of Houston Airport System. Simpson then approached Vardeman in an aggressive and threatening manner, and got within an inch of Vardeman's face. He then yelled at Vardeman saying, "You need to move the fucking car or I will whip your bitch ass."

16.     Vardeman's daughter, while still holding her baby in her left arm, stuck her right arm in between them in an attempt to create a separation between them and deescalate the situation. Simpson then aggressively and forcefully pushed Vardeman's daughter, without any regard for the baby she was holding.

17.     Vardeman, fearing for his daughter's safety and the safety of his grandchild, immediately pushed Simpson away from them without injury to Simpson. As soon as Vardeman pushed Rickey Simpson away from his daughter and grandchild, Simpson aggressively and violently struck Mr. Vardeman with a closed fist, in the right side of his face with such force it knocked him to the ground.

18.     Simpson then proceeded to walk around and stand over Vardeman, in a menacing manner and acting as if was going to strike Vardeman again while he was still on the ground. It was only when Vardeman's wife got in front of Simpson did he walk back to the sidewalk away from Vardeman.

19.     When Vardeman was finally able to get up off of the ground, he immediately dialed 911 to call the police and let them know that he was at the Hobby Airport Passenger Pick up and had just been verbally and physically assaulted by an airport officer.

20.     Vardeman then returned to his vehicle to and waited for the police to arrive. Two officers showed up from the Houston Police Department and one of them appeared to be a supervisor who took the details of the incident. The supervisor then went inside the airport security office and when he came back out he informed Mr. Vardeman that he had reviewed the security footage and stated that "The video clearly shows this man getting out of his car and his family approaching, shows him loading bags into the car and the next thing you see is this airport employee striking the man and the man falling to the ground.  He then stated "Why did this person even come over and engage this passenger."

21.     Vardeman also suffered physical pain and at least anxiety, fear, and depression due to the officer's actions and will likely suffer the same into the future.

22.     Simpson's training was by the City of Houston. Simpson was not sufficiently

trained by the City of Houston to put Simpson on notice that the force that he used in Vardeman was excessive. Furthermore, it is likely that Simpson has used excessive force before and the City of Houston has not reassigned, disciplined or fired Simpson. Simpson still works in the same place as the day he punched Vardeman and received no discipline

23.     Both Charles Chukwu in 2008 and Trenton Garrett in 2009 were severely beaten at a Houston jail by City of Houston employees without valid reason and despite, in both cases, there being a video of the incident clearly showing excessive force no City of Houston employee was disciplined in the matter even though IAD investigations were performed in both cases.

24.     There have been many instances of obvious excessive force at by the Houston Police Department and at the Houston jails which have been investigated by the City of Houston Police Internal Affairs Department ("IAD") and there has been no discipline or retraining.

25.     November 18, 2014 HPD Officer S. Corral is caught on video smashing a handcuffed arrestee Reuben Williams' head into an iron jail cell door. Then Officer Corral applies a neck nerve hold on a non-resisting Rueben until he passes out whilst bleeding profusely. To cover-up his crime Officer Corral falsely charges Reuben Williams with felony harassment of a public servant for spitting on him but then, quite strangely, fails to collect the important DNA rich saliva evidence. HPD Internal affairs reviewed the video and yet no discipline was meted out as smashing a handcuffed prisoner's head into an iron door jamb is allowable under the City of Houston jail practices. The harassment charge was dismissed.

26.     In 2016 Akrem Azzam was beaten several times by Houston jailer Lasswon Harris. Houston jailer Sheila Ross had the opportunity to intervene in the several beatings but chose not to. Jailer Shannon plead guilty to assault causing bodily injury in a Harris County court, sentenced to jail time and put on community supervision. Houston jailer Lasswon Shannon was caught on

video repeatedly striking handcuffed Azzam in the head and face and slamming him onto the filthy concrete jail cell floor with Jailer Ross looking on.

27.     Over the last 13 years there has been over 250 instances of Houston Police Department wounding and killing individuals by firearms yet there has been no discipline or finding of any misconduct by the shooting officers despite many instances of clear excessive force.

28.     The mayor, Houston Chief of Police Art Acevedo, McClelland and past Chiefs of Police and staff back to at least January 1, 2000 were aware of the many instances of excessive force at the jail and elsewhere that were unjustified but have not retrained or disciplined officers such that excessive force remains a custom and practice at the Houston City jails and elsewhere in Houston.

29.     Some of these instances include (all caught on video, reviewed by supervisors and no or inadequate discipline or retraining meted out):

1) July 21, 2000 - Wanda Brent; During pat down in the jail was taken to the ground with force when there was no need. Many HPD officers were involved.

2) February 17, 2007 - Steven Mikeasley is handled in hallway, pushed up against wall. Period of time off camera, then back in view hogtied.

3) June 5, 2007 or March 5, 1997 - Brian Golott. Brought into the jail intake are forcefully without reason. Put on gurney and taken to isolation. City blacks out center of a video recording out so can't see what's going on. At least 3 HPD officers involved.

4) September 23, 2007 Inmate taken down without reason with many HPD officers involved.

5) November 19, 2007 - Hasan Matthews was suddenly taken down by 3 officers and handcuffed in initial jail booking area.

6) January 27, 2008 - Samuel Smith was talking on the phone in the jail holding cell when 2 officers enter, take him down and lead out without reason.

7) April 4, 2008 - Alexandra Koch (sp.?) was laying on floor in isolation, 6 HPD officers or jailers come in, wrestle with her and take her out of room and out of camera visual. She's on the ground and the officers walk away. It appears that a few come and check on her and she's taken out of the police department and put in an ambulance.

8) May 26, 2008 - Kenneth Cert (sp.?) suddenly on the ground on other side of jail hall with one officer or jailer. Video excises 30 seconds until next frame and Kenneth is standing up on the initial side of the hall.

9) June 5, 2008 - Nakia Stark (sp.?) something happens at the jail intake windows and she's taken to isolation. She hits the walls and is in isolation for about 10 minutes before they take her out and take photos. She then leaves space.

10) June 21, 2008 - Jeffrey Clark man in white shirt taken down and cuffed during booking for no apparent reason.

11) June 21, 2008 (?) -Man in yellow shirt and red visor is on the phone in holding cell. He walks past the door and sits down. He is grabbed and taken down
by 3 officers without reason.

12) July 26, 2008 - Clyde Jones is taken down in first few jail video frames by officers and punched for no apparent reason.

13) September 30, 2008 - Furrell Holmes. Officers break up a fight in the jail cafeteria. Officer tackles a guy in sleeping area and video is altered.

14)  October 18, 2008 – inmate taken down on video without reason then 2, 3, then 4 officers punching and kicking him. Taken down the hall and pushed up against the wall.

15) December 28, 2008 - Three officers carry in guy with a bloody head lifted into the air.

16) January 17, 2009 - Timothy Peavy was held against a wall when handcuffed and taken down by 5 officers without reason.

17) April 12, 2009 - Oliver Nicholas was suddenly on ground but video is altered.

18) August 23, 2009 - Inmate is cell hall and is hit repeatedly and choked without reason.

19) October 13, 2009 - C. Whitley. Officer goes after inmate and brings him to the ground. Takes multiple officers to get under control. Force was greater than needed.

20) December 12, 2009 - Eric Cossie was thrown down by neck. There was no reason as inmate doesn't fight back just puts up hands to protect himself.

21) February 13, 2010 - David Compean is in booking area, he stands up and is jumped by officers, cuffed and put in isolation. Uncuffed and cooperates through rest of booking.

22) March 3, 2010 – Inmate Cooper is taken out of cell and put in isolation by dragging. Inmate Cooper then bangs on door and officers come in, take him out of frame and then bring back in. Inmate Cooper is again dragged out of frame and out

of video view for over a minute. Bangs on door and taken out again for a long period of time.

23) May 3, 2010, David Luke during check-in (long room with windows to take items), attacked, taken down, cuffed and taken to cell. Left in cell for long period of time, still handcuffed.

24) August 12, 2010 - W. Cotley. Woman officer comes into elevator, yells and hits (pushes him back with a throat hit). He tries to keep her away and she keeps coming at him. Multiple officers hold her back and she continues to try to get to him.

25) August 15, 2010 – Inmate Harrison Taken down, head hit to ground. Doctor comes and puts a bandage on. Officers use excessive force during cuffing and break his arm. Laying on ground and unable to use right arm. Doctor comes back and puts it in a splint.

26) March 16, 2011 - Lewis Henderson is checking in his items when officer takes him down and cuffs him for no reason.

27) April 27, 2011 - Donald Brooks brought in superman style (feet off floor) because made himself limp. Another rough lift by handcuffs behind his back and pushed to sitting position. Dragged by cuffed wrists to cage. As soon as in cage, he stands up and is angry. Officers go to take him out, he resists and is dragged out of frame.

28). June 24, 2011 - Charles Perez is in hallway, takes a step forward and officer pushes him back, takes him down and 2 more officers assist without reason.

29) October 24, 2011 - Pedro Barrero in is jail booking area and is thrown down for no apparent reason.

30) The City of Houston Police Department Homicide Division is the main investigator, taking witness statements and collecting evidence among other investigatory activities in all Houston Police shootings including Phillip's shooting.

31) Around FOUR HUNDRED FIFTY (450) HPD officers have been involved in the killing or wounding of civilians since January 1, 2004 yet not one HPD officer has been indicted when HPD Homicide Division's collected evidence and conclusions were presented to a Harris County Grand Jury. Furthermore, there is no evidence that since January 1, 2004 a single HPD officer has been disciplined for a City policy violation due to shooting a civilian after the HPD Internal Affairs Department investigation into the shooting. About 25% of these shootings involved citizens with no weapons.

32) In December, 2016 new Houston Police Chief Acevedo stated he was creating a special HPD unit apart from homicide to investigate situations such as shootings of civilians.

33) On October 1, 1998, HPD Officers Anthony M. Ruggeroli and Brian T. Mitchel shot at suspects in a stopped car when they did nothing more than not respond immediately to verbal commands. Officer Ruggeroli merely shouted a few commands then left cover and went to the passenger window and shot at the unarmed driver. Officer Mitchel than ran up to the *passenger window and smashed it* and grabbed the passenger. The officers were not disciplined for using excessive force nor retrained in use of force or the proper high risk vehicle approach tactics,

indicating ratification and acceptance of patterns, practices, customs and/or procedures of the excessive use of force.

34) In 1999, HPD Sgt. Glover's gun went off and struck a suspect when he used it to bash in passenger side window. Officer Shockley then discharged his weapon striking the other suspect in the vehicle. Despite using excessive force on both suspects and failure to use safe high risk vehicle approaches and full IAD investigation, there was no discipline or retraining as a result of this incident, indicating ratification and acceptance of HPD's excessive use of force and dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, and customs.

35) In 1999, Jason Arboleda was shot and killed by HPD Officer R. A. Williams. Jason had left a bar with his friend Franky Aguirre, who was a passenger. On the way out from the area he struck, but did not seriously injure, Officer R. A. Williams. Officer Williams then chased after Mr. Arboleda on foot and stopped him at a traffic light as Jason tried to flee in his vehicle. Officer Williams ordered Mr. Arboleda out of the car and on to the ground to which Mr. Arboleda complied. At that point, Officer Williams did *not* handcuff or otherwise secure Mr. Arboleda, who then jumped back in his car. The officer ran to the front of the car instead of obtaining cover. As Mr. Arboleda drove forward, Officer Williams shot and killed Jason. Officer Williams was not hit by the car and even felt safe enough to shoot rather to spend time getting out of the way. Despite IAD investigation, Officer Williams was not disciplined or retrained in the use of excessive force or high risk vehicle approach. The City determined it was a justified shooting and it never addressed

Officer Williams' failure to follow either the written HRVA policy or any safe HRVA method. Further, the City did not order any training, indicating ratification and acceptance of HPD's dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, customs and/or procedures and use of force.

36) In 2000, HPD Officer R. C. Headley stopped a vehicle and determined it was stolen. Officer Headley then shot Mr. Langston (driver) and Mr. Plumbar (passenger) when there was no reason to do so. Neither person was armed. Despite IAD investigation, there was no discipline nor training ordered.

37) In 2000, Officer Selvyn J. Ellis, who had 47 sustained complaints against him, received a suspension instead of firing, despite the fact he refused to answer questions during an IAD inquiry into improper conduct, including allegations of assault. He had previously been suspended for injuring a bar patron while working an extra job and not reporting the use of force.

38) In 2002, Officer Ted A. Adams, who has 41 sustained complaints against him, received a one day suspension instead of firing for not reporting the use of force after injuring a female after knocking her to the pavement with a leg sweep.

39) In 2003, Houston Police Lieutenant Hillman was involved in a faulty high-risk vehicle approach and used excessive force against unarmed Kevin Lunsford. When Hillman got near Lunsford he claimed that Lunsford moved and then Lt. Hillman shot and killed Lunsford. Despite IAD investigation, there was no discipline for excessive use of force or any training required.

40) On October 31, 2003, HPD Officer Butler was working at a large AMC movie

theater in west Houston when 15 year old Jose Vargas was purportedly playing his radio too loud in his vehicle on his way to see a movie with his three teenage friends. Officer Butler went to investigate and the kids left. Officer Butler claimed the kids did not obey his commands to stop so Butler then gave pursuit. Vargas was scared and drove off. Officer Butler rushed up to the vehicle on foot when it was stopped in traffic with his gun drawn and not under any cover. This startled the 15 year old unarmed Vargas and the vehicle lurched forward with Officer Butler at the side of the driver's window. Officer Butler then shot and killed Vargas. Vargas had no criminal history. Despite the obvious excessive use of force and IAD investigation, Officer Butler was not disciplined nor retrained in the use of force.

41) In 2003, Mr. Juan Lozano was killed because HPD Officer R. L. Plotner used faulty high risk vehicle approach techniques by approaching a vehicle and failing to get under cover and give verbal commands to Lozano in a vehicle after a pursuit. Without being in fear of his life or serious bodily injury, Plotner shot and killed Juan. This officer was not disciplined or retrained in proper high risk vehicle approach tactics nor excessive use of force, indicating ratification and acceptance of HPD's dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, customs and/or procedures similar to those that killed Roland.

42) In 2003, HPD Officer Rivera made a stop of a felony suspect in a van. Instead of gaining cover and shouting verbal commands, Officer Rivera left cover and approached the van exposed. Officer Rivera shot the van driver when he was not frightened for his life. Officer River, however, should have maintained cover and a

position of advantage. Officer Rivera was not disciplined or retrained for use of excessive force despite IAD investigation.

43) In 2004, HPD Officer C. Pena Jr. shot and seriously wounded an unarmed 16 year-old girl who was under a vehicle. Officer Pena gave verbal commands to LaDonna Banks and then shot her. Officer Pena received no discipline and no training in gaining cover when dealing with suspects and his use of excessive force.

44) In 2005 HPD Officer Thompson used faulty high-risk vehicle approach techniques and excessive force resulting in the shooting of an unarmed suspect, Timothy M. Thomas, who was driving when Officer Thompson pulled him over. Officer Thompson became suspicious because the driver was black and he had heard of a black felony burglary suspect. At first, Officer Thompson was behind cover and using his bullhorn. This only lasted a few minutes and then the officer left his cover and approached the vehicle with his gun drawn. Mr. Thomas started to get out of the car and when he did, he was shot by Officer Thompson who said he was in fear of his life due to Mr. Thomas' innocent movements. Thomas had no gun. Officer Thompson obviously used excessive force and faulty high risk vehicle approach. Officer Thompson was not disciplined and there was no training despite a full HPD IAD investigation.

45) August 14, 2007, a 17 year old unarmed girl was seriously wounded because of faulty high risk vehicle approach. Brittanee King, 17, was a *littering* suspect who had fled in a

car for a short distance and was pursued by HPD Officer Carraway approached her with gun drawn. When Brittanee stopped the vehicle to comply with the officer,

Officer Carraway failed to use safe HRVA methods and left cover and exposed himself in full view of the young unarmed girl in the car. When the unarmed Brittanee made an innocent movement, Officer Carraway claimed he feared for his life because he was not behind cover and in a position of advantage and shot Brittanee, wounding her. Officer Carraway claimed he saw a shiny object-- Brittanee was wearing shiny bracelets. Despite the admission of unsafe HRVA approach methods and use of excessive force, no discipline or training was administered despite an IAD investigation

46) In 2008 Charles Chukwu was arrested and taken to the City of Houston jail at Mykawa Road where he was beaten by at least one City of Houston jailer without any reason. After the beating, Mr. Chukwu was purposefully released before he could get the names of the jail inmate witnesses. The jailers failed to file a timely use of force report and did not stop the beating of Mr. Chukwu, nor did the Houston jailers report another Houston jailer for the obvious excessive force. The jailers refused to take Mr. Chukwu to the jail clinic or hospital where the injuries could be documented, despite the excessive use of force and obvious injures.

47) The Chukwu incident was caught on videotape and investigated by the Houston IAD. It failed to find any violation when, in fact, excessive force had been used against Mr. Chukwu. Mr. Chukwu asked for the videotape from former City Mayor Bill White, Houston City Council and the HPD IAD, but was refused. At a Houston City Council meeting, Councilman Adrian Garcia stated that the videotape should be released. City Council member Sue Lovell asked the HPD IAD about the Chukwu jail beating video, however, she apparently never received a copy of the

Chukwu video. More than two years after the alleged beating, Mr. Chukwu has not received the beating videotape.

48) On June 22, 2008, Henry Lee Madge was struck several times while in handcuffs by a Houston police officer without justification and the officer was not disciplined.

49) Around February 6, 2009, Trenton Garrett was arrested and taken to the Houston jail at Mykawa Road where City of Houston jailers beat him without any reason. The jailers failed to file a timely use of force report and did not stop the beating of Mr. Garrett, nor did the Houston jailers report another Houston jailer for the obvious excessive force. The jailers refused to take Mr. Garrett to a hospital where the injuries could be documented despite the excessive use of force and obvious injures. The incident was caught on videotape and investigated by the Houston IAD which failed to find any violation, when in fact, excessive force had been used against Mr. Garrett. Mr. Garrett asked for the videotape from the HPD IAD but was refused. More than two years after the alleged beating, Mr. Garrett has not received the beating videotape.

50) On August 5, 2009, Hatice Cullingford, Ph.D. ("Dr. Cullingford"), 65, was arrested by the Houston Police Department. Dr. Cullingford had never been convicted of any crime in her life and never previously been arrested for any crime. At the City of Houston Mykawa jail, Houston jail employees used excessive force on Dr. Cullingford yet no discipline resulted.

51) In the late Spring of 2010, 15-year old Chad Holley was purposefully struck by a Houston police squad car and then violently beaten--by kicking, stomping and

punching in the head, groin and other parts of his body--by least four Houston police officers while other Houston police officers looked on without intervention. Chad Holley was not resisting but had laid down on the ground with his hands behind his back. No officer attempted to stop the beating by the other officers and after the beating no officer reported any other officer for the incident.

No use of force report was filled out by any officer in a timely manner. The Mayor of Houston, Annise Parker, thereafter, would not allow the release of a videotape showing the incident to the public.

52) In February, 2011, a videotape of the Chad Holley beating was released to local Houston television station KTRK, Channel 13, by a Houston citizen. Houston City Mayor Annise Parker then threatened the citizen and berated KTRK Channel 13: "Whoever provided the video to Channel 13 is in violation of a federal court order and should be prosecuted." The citizen was not a party to the lawsuit nor was any protective order directed at the citizen.

53) On February 8, 2011, at a Houston City Council public meeting discussing the Chad Holley excessive force incident and past police excessive force incidents, Houston City Attorney David Feldman interrupted Houston City Councilpersons, such as Melissa Noriega, who were talking about the videotape of Holley and past instances of police brutality that could affect city liability. Mr. Feldman then instructed the City council to not to talk about the Chad Holley case. This was a sentiment Mayor Parker also verbalized. Council member Noriega agreed and stopped talking about excessive force events as did the Mayor and other City

Councilpersons. For the past twenty years there have been excessive force cases against the City pending at all times, so under this policy the council members cannot speak about excessive force cases in public meeting.

54) The following individuals were assaulted and injured by Houston police and or Houston jailers the events of which were caught on video and then viewed by the Houston employee's supervisor and no discipline or retraining was meted out. In each instant there was no need to apply the level of force used by the City of Houston employees:

## VIOLATION OF THE 4TH AND 14TH FOURTEENTH AMENDMENTS

30.     Plaintiff incorporates all preceding paragraphs as if set fully set forth herein.

31.     The Fourth Amendments guarantees everyone the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV*. The 14th Amendment allows for due process of law. Such violations are actionable pursuant to 42 U.S.C. Section 1983 and 1988.

32.     The force used by the individually named defendant, was in great excess to the need to use such force and constituted an Unreasonable Seizure of Vardeman and violated his due process rights under the 14th Amendment. The defendant made false statements in the police incident report.

33.     The City of Houston has a custom, policy, practice, and procedure of using excessive force on individuals and not disciplining or training officers adequately and is therefore liable under 42 U.S.C. Section 1983 and 1988.  There is a pattern and practice of excessive  force and condoning excessive force. There is a pattern and practice of charging suspects with resisting arrest, failure to identify, assault on a peace officer, and other crimes to cover up excessive

force. The City of Houston police disciplinary system lets too many officers go unpunished for excessive force. Vardeman was not trained sufficiently by the City. The City ratified Vardeman's behavior by failing to discipline him. The City has a pattern of failing to discipline and supervise its airport employees.

## ASSAULT AND BATTERY

34.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

35.     The individually named defendant committed assault upon Vardeman and caused the damages described herein.

## MENTAL ANGUISH

36.     Plaintiff incorporates all preceding paragraphs as if set fully set forth herein.

37.     Vardeman suffered at least anxiety, fear, anger and depression because of the acts of the individually named defendants and the City of Houston and, therefore, Vardeman seeks damages for mental anguish past and future as well as the pain and suffering, past and future, and other damages set forth above.

## PUNITIVE DAMAGES

38.     Vardeman incorporates all preceding paragraphs as if set fully herein.

39.     The individually named defendants actions and inactions cause them to be liable for punitive damages as they were consciously indifferent to the plaintiff's constitutional rights and they did the acts knowingly, such acts being extreme and outrageous and shocking to the conscious.

## NEGLIGENCE

40.     In the course of the transactions between Plaintiff and Defendant, Defendants owed Plaintiff a duty to protect him while on the premises of the Houston Hobby Airport.

41.     Plaintiff would show that Defendants failed to exercise ordinary care in performing such duty.  The acts and/or omissions of Defendants described hereinabove by which Defendants breached such duty constitute a proximate cause of the damages of Plaintiff described more fully herein below, for which Defendants are liable to Plaintiff.

## DELIBERATELY INDIFFERENT/NEGLIGENT
## HIRING, SUPERVISION, AND/OR MANAGEMENT

42.     Plaintiff would show that Defendants City of Houston and Simpson owed a duty to clients and customers, including Plaintiff, to exercise ordinary care in the hiring of competent employees, and in the supervision and management of said Defendant's employees.

43.     Plaintiff would further show that Defendants City of Houston and Simpson failed to use ordinary care in these respects, including but not limited to failing to properly investigate potential job applicants, failing to properly supervise said Defendants personnel, failing to implement adequate safeguards to prevent the situation that resulted in Plaintiff's damages, and failing to provide adequate oversight for such employees. These conditions created an environment in which the employees of defendants were free to verbally harass and physically assault patrons, customers, visitors and/or clients of at the Houston Hobby Airport. The actions of the employees of Defendant Houston Hobby Airport were likely and reasonably foreseeable to occur, and which in fact did occur in the course of the transactions involving Plaintiff described hereinabove, which proximately caused the damages sustained by Plaintiff herein, and for which Plaintiff hereby sues.

## AGENCY

44.     At and during the time of the acts and/or omissions complained of herein, any acts and/or omissions committed by an agent, representative or employee of the City of Houston, Defendant, occurred within the scope of the actual or apparent authority of such person on behalf of said Defendants.

45.     Said Defendant is therefore liable to Plaintiff for the acts and/or omissions of any such agent, representative or employee complained of herein by virtue of such agency relationship.

## RESPONDEAT SUPERIOR

46.     At and during the time of the acts and/or omissions complained of herein, said acts and/or omissions of any employee of the City of Houston Defendant, occurred within the scope of the general authority and for the accomplishment of the objectives for which such employee was employed.

47.     Defendant City of Houston is therefore liable to Plaintiff for the acts and/or omissions of any such employee complained of herein under the doctrine of *respondeat superior.*

## ACTUAL DAMAGES

48.     Plaintiff sustained the following actual damages as a result of the actions and/or omissions of Defendants described hereinabove:

(a)     Reasonable medical care and expenses in the past.

(b)     Reasonable and necessary medical care and expenses which will in all reasonable probability be incurred in the future.

(c)     anxiety, fear, depression, anger and other mental anguish in the past and future.

(d)     Constitutional rights violation.

## OTHER DAMAGES

48.     Plaintiff would further show that acts and/or omissions of Defendants complained of herein were a producing cause and a proximate cause of the following damages sustained by Plaintiff:

(a)     Bodily injury to his face.

## DAMAGES FOR MENTAL ANGUISH

49.     Plaintiff would further show that the acts, practices and/or omissions described hereinabove were committed "knowingly," as provided by Section 17.45(9) of the Texas Business and Commerce Code, in that Defendant had actual awareness of the acts, practices, and/or omissions or other law.

50.     As a result of such acts, practices and/or omissions, Plaintiff sustained a high degree of mental pain and distress of such nature, duration and severity that would permit the recovery of damages for mental anguish pursuant to Section 17.50(b) of the Texas Business and Commerce Code, and for which Plaintiff hereby sues in an amount in excess of the minimum jurisdictional limits of this Court.

## PUNITIVE DAMAGES

51.     Vardeman incorporates all preceding paragraphs as if set fully herein.

52.     Simpson's actions caused him to be liable for punitive damages as he was consciously and deliberately indifferent to the plaintiff's constitutional rights and he did the acts knowingly, such acts being extreme and outrageous and shocking to the conscious.

## ATTORNEYS' FEES

53.     Vardeman is entitled to recover attorneys' fees and costs to enforce his Constitutional rights and under 42 U.S.C. Sections 1983 and 1988.

## JURY TRIAL

54.     Vardeman requests a trial by jury on all issues triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff William Vardeman requests that the Court:

A.     Enter judgment for the plaintiff and against Defendants holding them jointly and

severally liable;

      B.     Find that Plaintiff is the prevailing party in this case and award attorneys' fees and costs, pursuant to federal law, as noted against all defendants;

      C.     Award damages to Plaintiff for the violations of his rights under the 1st, 4th and 14th Amendments and under state law;

      D.     Award Pre- and post-judgement interest;

      E.     Award Punitive damages against each and every individually named defendant, and

      F.     Grant such other and further relief as appears reasonable and just, to which plaintiff shows himself entitled.

Respectfully Submitted,

*/s/ Randall L. Kallinen*
Kallinen Law PLLC
State Bar of Texas No. 00790995
Southern District of Texas Bar No.: 19417
511 Broadway Street
Houston, Texas 77012
Telephone:   713.320.3785
FAX:       713.893.6737
Email: attorneykallinen@aol.com

*/s/ William Capasso*
William Capasso
Texas Bar No. 24014271
Law Office of William Capasso, PLLC
Attorney at Law
8866 Gulf Freeway, Suite 440
Houston, TX 77017
Telephone:   713-928-6700
FAX:       713-928-3700
Email: wpc@capassolaw.com

ATTORNEYS FOR PLAINTFF

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing has been transmitted to the all counsel appearing in this cause and pro se parties on this the 6th Day of November 2020 by filing with the ECF System of the United States District Court for the Southern District of Texas.

/s/ *Randall L. Kallinen*
Randall L. Kallinen
